UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CAROLYN CHAUDOIN, individually and                                        PLAINTIFF
as Administratrix of the Estate of Thomas
Earl Ferguson

v.                                              CIVIL ACTION NO. 3:13-CV-00472-CRS

JAMES E. WILLIAMSON, ET AL.                                              DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Defendants' motion for summary judgment (DN 44). For the following reasons, the Court will grant in part and deny in part Defendants' motion. Plaintiff's federal claims will be dismissed with prejudice, and her state law claims will be dismissed without prejudice.

**I.      BACKGROUND**

This case arises from the shooting death of Thomas Earl Ferguson after a nighttime pursuit by law enforcement through LaRue County, Kentucky. The following facts are drawn chiefly from video evidence, which all parties agree accurately depicts the events at issue. Unless otherwise noted, the facts are not in dispute.

At approximately 9:25 p.m. on December 7, 2012, LaRue County Deputy Sheriff James E. Williamson received a call from the radio dispatcher requesting that he respond to a complaint of reckless driving in a residential area. (Dispatch Radio Transm'ns, DN 49, 50, Ex. 3.) The car, driven by Ferguson, was described as "cutting doughnuts" in lawns, "driving all over the place," and "going in and out of the driveways." (Dispatch Radio Transm'ns, DN 49, 50, Ex. 3.) While traveling to the scene and searching for the suspect, Williamson received numerous radio calls

-1-

updating him as Ferguson roamed about the area. (Williamson Dep., DN 44-3, at 83; Dispatch Radio Transm'ns, DN 49, 50, Ex. 3.) Upon locating the suspect, Williamson witnessed Ferguson's vehicle moving in circles across a yard. (Williamson Dep., DN 44-3, at 83–84.) As Williamson's cruiser approached, Ferguson returned his car to the roadway and fled. (Williamson Dep., DN 44-3, at 95.) Williamson then took up the pursuit. (Williamson Dep., DN 44-3, at 95.)

Williamson's dashboard and lapel cameras captured the subsequent events in large part. (Dash. Camera Video, DN 42, 45; Lapel Camera Video, DN 42, 45.) However, Williamson did not activate his cameras in time to record the initial portion of the chase. (Williamson Dep., DN 44-3, at 96–97.) Williamson testified that the speed of the pursuit and his frequent calls to the radio dispatcher prevented him from turning on the cameras safely at that time. (Williamson Dep., DN 44-3, at 96.) The parties dispute whether the pursuit took place at "high speed." (*See* Williamson Dep., DN 44-3, at 96–97; Weaver Dep., DN 48-8, at 12–13.) The Court cannot determine the exact rate of speed at any particular point in the chase solely from the video evidence. But, whatever the precise rates of speed, the video evidence makes clear that the pursuit involved such speeds that Ferguson had great difficulty controlling his vehicle. (Dash. Camera Video, DN 42, 45, at 2:19–2:25.)

Throughout the pursuit, Ferguson led Williamson down winding roads—so narrow that no yellow lines marked the separate lanes. (Dash. Camera Video, DN 42, 45, at 0:00–2:28.) The two cars hurried past residences at night.[1] All the while, Ferguson's vehicle weaved back and forth across the roadway. (Dash. Camera Video, DN 42, 45, at 0:00–2:28.) Ferguson disregarded three stop signs in this erratic attempt to escape. (Dash. Camera Video, DN 42, 45,

---

[1] The dashboard camera video contains direct images of four residences, and the mailboxes lining the roads indicate the presence of other homes. (Dash. Camera Video, DN 42, 45, at 0:01–0:04, 0:16–0:18, 0:46–0:51, 2:23–2:30.)

at 0:57–0:59, 1:50–1:53, 2:10–2:13.) Ferguson's vehicle ultimately spun out of control when the passenger's side tires slipped from the road. (Dash. Camera Video, DN 42, 45, at 2:19–2:25.)

The spin left Ferguson facing in the direction of Williamson's oncoming cruiser. (Dash. Camera Video, DN 42, 45, at 2:25–2:30.) Seeing the suspect temporarily stopped, Williamson positioned his cruiser directly in front of Ferguson's car to block a forward escape. (Dash. Camera Video, DN 42, 45, at 2:25–2:30; Williamson Dep., DN 44-3, at 100.) Williamson exited his vehicle and moved away from the cruiser to the edge of the road. (Lapel Camera Video, DN 42, 45, at 1:45–1:47.) With his weapon drawn, Williamson shouted for Ferguson to surrender. (Lapel Camera Video, DN 42, 45, at 1:45–1:53.) Rather than comply with those verbal commands, Ferguson started to back his vehicle away from Williamson's cruiser. (Dash. Camera Video, DN 42, 45, at 2:31–2:33; Lapel Camera Video, DN 42, 45, at 1:46–1:48.) Williamson then tried to disable Ferguson's car by firing three shots at the passenger's side tires. (Lapel Camera Video, DN 42, 45, at 1:46–1:48; Williamson Dep., DN 44-3, at 100–01, 105; Photographs of Vehicle, DN 48-13.)

Still, Ferguson persisted in his efforts to escape. Ferguson pulled forward with his engine revving and headlights shining into Williamson's lapel camera. (Lapel Camera Video, DN 42, 45, at 1:48–1:53.) Ferguson's vehicle passed between Williamson and the cruiser. (Lapel Camera Video, DN 42, 45, at 1:48–1:57.) As Ferguson moved away, Williamson fired eight shots to stop the fleeing driver. (Lapel Camera Video, DN 42, 45, at 1:52–1:57; Williamson Dep., DN 44-3, at 111.) After this gunfire, Ferguson's vehicle crashed into a roadside ditch. (Lapel Camera Video, DN 42, 45, at 1:57–2:03.) Ferguson later died from a single gunshot wound to the head. (Am. Compl., DN 13, ¶ 14.) The entire encounter—from the moment

Williamson left his cruiser to the final shot fired—lasted only twelve seconds. (Lapel Camera Video, DN 42, 45, at 1:45–1:57.)

On May 8, 2013, Plaintiff Carolyn Chaudoin—individually and as administratrix of Ferguson's estate—commenced this action under 42 U.S.C. § 1983[2] against Defendants LaRue County, the LaRue County Sheriff's Office, current LaRue County Sheriff Merle Edlin, former LaRue County Sheriff Bobby Shoffner, and Williamson.[3] (Compl., DN 1; Am. Compl., DN 13.) Plaintiff alleges that Williamson seized Ferguson using excessive force in violation of the Fourth Amendment and that LaRue County, the LaRue County Sheriff's Office, Edlin, and Shoffner failed to adequately train and supervise officers. (Am. Compl., DN 13, ¶¶ 16, 24.) Plaintiff also asserts several claims under Kentucky law. (Am. Compl., DN 13, Cts. II–IV.) Defendants now call upon this Court to grant summary judgment in their favor on all of Plaintiff's claims.

## II.  STANDARD

The Court shall grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of explaining the basis of its motion and demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). That burden may be satisfied only by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the . . . presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). Should the movant meet its burden, the nonmoving party may not simply rest on its prior

---

[2] Plaintiff's First Amended Complaint also lists 42 U.S.C. § 1981 as statutory authority without identifying its relevance. (Am. Compl., DN 13, ¶ 1.) Plaintiff's factual allegations do not appear germane to a § 1981 claim, and throughout the litigation, the parties focused all attention on § 1983 when discussing the federal claims. To the extent any such claim was initially contemplated, it is deemed abandoned.
[3] Plaintiff brought suit against Shoffner and Williamson in their individual and official capacities, but she named Edlin in his official capacity only. (Am. Compl., DN 13, ¶¶ 3, 4a.)

-4-

pleadings; it must produce further evidence showing a genuine issue for trial. *Celotex*, 477 U.S. at 324.

When considering a motion for summary judgment, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). Even so, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient . . . ." *Id.* at 252.

### III. DISCUSSION

#### A. Section 1983 Claim Against Williamson in His Individual Capacity

The Court begins by addressing the § 1983 claim against Williamson in his individual capacity. Section 1983 imposes civil liability on any person who, acting under color of state law, deprives another of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. Plaintiff claims that Williamson deprived Ferguson of his rights under the Fourth Amendment by using deadly force to prevent his escape. Williamson, however, contends that no constitutional violation occurred and also asserts qualified immunity as an affirmative defense.

Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). The purpose

of qualified immunity is to insulate officials from "undue interference with their duties and from potentially disabling threats of liability." *Id.* at 806. "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

Moreover, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985). The privilege is "an *immunity from suit* rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Id.* Therefore, the issue of qualified immunity should be resolved "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (per curiam).

The analysis of a qualified immunity defense consists of two inquiries: (1) whether the facts, taken in the light most favorable to the plaintiff, support a finding that the defendant violated a statutory or constitutional right and (2) whether that right was "clearly established" when the alleged violation occurred. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). The Court may exercise its discretion in deciding which of the two inquiries to address first based on the circumstance of the case at hand. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). "When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

### 1. Merits of the Alleged Fourth Amendment Violation

A claim that a law enforcement officer used excessive force—deadly or non-deadly—to effect the seizure of a free citizen is properly analyzed under the Fourth Amendment's

"reasonableness" standard.[4]  *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985). To decide whether the force used was reasonable, the Court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8). This standard demands "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

In applying the "reasonableness" standard, the Court engages in an objective inquiry. *Id.* at 397. The question is whether the officer's actions were "objectively reasonable" in light of the facts and circumstance that confronted him, "without regard to [his] underlying intent or motivation." *Id.* (internal quotation marks omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The Court thus "allow[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. "What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

---

[4] Once the Court determines the relevant set of facts and, to the extent supportable by the record, draws all reasonable inferences in favor of Plaintiff, the reasonableness of Williamson's actions under the Fourth Amendment is "a pure question of law." *Scott v. Harris*, 550 U.S. at 381 n.8; *accord Marvin v. City of Taylor*, 509 F.3d 234, 244 (6th Cir. 2007).

With respect to the use of deadly force on a fleeing felony suspect, the Fourth Amendment does not permit a police officer to "seize an unarmed, nondangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11. However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id.*

From those general principles, the Sixth Circuit developed the following framework to assess the use of deadly force in cases involving vehicular flight:

> Although each case is tethered to its specific factual context, the critical question is typically whether the officer has "reason to believe that the [fleeing] car presents an imminent danger" to "officers and members of the public in the area." An officer is justified in using deadly force against "a driver who objectively appears ready to drive into an officer or bystander with his car." But, as a general matter, an officer may not use deadly force "once the car moves away, leaving the officer and bystanders in a position of safety." An officer may, however, continue to fire at a fleeing vehicle even when no one is in the vehicle's path when "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car."

*Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014) (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012); *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (citations omitted).

In this case, Williamson faced the fleeing suspect alone, without other officers or bystanders at the immediate scene, and a review of the evidence confirms that Williamson did not discharge his weapon while standing in the direct path of the moving vehicle. The lapel camera video shows the passenger's side of Ferguson's car passing Williamson before he fired the relevant series of shots. (Lapel Camera Video, DN 42, 45, at 1:50–1:54.) Williamson's deposition is consistent with this video evidence. Williamson testified that he did not shoot as the vehicle came toward him, but instead fired when the vehicle was "even with [him] and past [him]." (Williamson Dep., DN 44-3, at 110–11.) Finally, the two bullets that passed through the

-8-

driver's headrest, one of which fatally wounded Ferguson, entered the vehicle through the driver's side portion of the rear window. (Photographs of Vehicle, DN 48-13.) Those trajectories indicate that Williamson fired the deadly shot from a position behind Ferguson's vehicle.

Because no one was in the direct path of the fleeing vehicle, the principal issue here is whether Williamson's prior interactions with the suspect suggest that Ferguson would have continued to endanger others with his car. *Cass*, 770 F.3d at 375. Again, the Court notes that its inquiry is one of objective reasonableness, which includes "a built-in measure of deference to the officer's on-the-spot judgment" in a difficult situation. *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). The Court "must avoid substituting [its] personal notions of proper police procedure for the instantaneous decision of the officer at the scene." *Freland*, 954 F.2d at 347. After examining the facts that confronted Williamson before the shooting, the Court concludes that his use of deadly force to end Ferguson's dangerous flight was objectively reasonable.

From the moment Williamson first encountered Ferguson, he witnessed the driver's reckless disregard for the safety of others. Williamson watched as Ferguson steered his car through a lawn, conducting risky maneuvers that could have easily caused him to lose control and careen into the home of an innocent civilian. The brashness of Ferguson's behavior only escalated once he noticed the approaching police cruiser. Rather than cease his reckless conduct, Ferguson chose to flee.

Williamson pursued Ferguson down narrow, winding roads. Along this route, he observed the suspect ignore three stop signs and weave from one side of the road to the other. The pursuit rushed by several homes in the dark of night. Throughout the chase, Ferguson drove

in a manner that prevented him from maintaining full control of the car. In fact, Ferguson's vehicle eventually entered a wild spin without any interference from Williamson's cruiser.

After the spinout, Williamson found the suspect's vehicle nearly facing the front of his police cruiser. To create an improvised roadblock, Williamson pulled his cruiser within inches of Ferguson's front bumper and stepped out with his weapon drawn. Williamson shouted for Ferguson to exit his car, but instead of complying, Ferguson started to move his vehicle in reverse. Williamson then fired several rounds at the passenger's side tires to disable the vehicle. Undeterred, Ferguson pulled forward with his engine revving to run Williamson's roadblock.

As Ferguson's car passed between Williamson and his cruiser, the officer was required to make a split-second decision: Should he end the pursuit by using deadly force, or should he resume the chase and accept the risk that the suspect's dangerous driving might seriously injure or kill innocent civilians? Williamson decided to end the pursuit at that moment. He opened fire as the fleeing car moved away, ultimately killing Ferguson.

In judging the reasonableness of Williamson's conduct, it carries great significance, as it did in *Freland*, "that the events in question happened very quickly." *Id.* Only twelve seconds elapsed between Williamson exiting his cruiser and the final shot fired. (Lapel Camera Video, DN 42, 45, at 1:45–1:57.) Within that short time span, Williamson was expected to balance the risk of seriously harming a fleeing felony suspect by using deadly force against the danger that suspect posed to others in the area. While seated comfortably in a law office or judicial chambers, pondering the issue at one's own pace, it is difficult to adopt the officer's viewpoint in the circumstances faced by Williamson. However, the Court "must never allow the theoretical, sanitized world of [its] imagination to replace the dangerous and complex world that policemen

-10-

face every day." *Freland*, 954 F.2d at 347. That dangerous and complex world forced Williamson to act in less than twelve seconds.

From the perspective of a reasonable officer, Ferguson (1) disregarded the safety of others in his initial reckless conduct; (2) refused to obey verbal commands; (3) was undeterred by having a weapon pointed in his direction and fired at his vehicle; (4) actively resisted arrest by fleeing and charging a roadblock; and (5) was willing to risk the lives of officers, pedestrians, and other drivers to evade capture. Once Ferguson slipped through the roadblock, leaving Williamson outside of the vehicle's path, "no reasonable officer would say that the night's peril had ended at that point." *Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 155 (6th Cir. 2013). Williamson could not predict the outcome of resuming his pursuit of Ferguson, but he understood from prior observations that the suspect's behavior presented a great risk to people in the area. When wielded by a dangerous driver, "a car can be a deadly weapon." *Freland*, 954 F.2d at 347. Ferguson could have easily collided with an innocent and unsuspecting citizen after restarting his nighttime flight down the narrow roads. Even if Williamson simply ceased pursuit and allowed Ferguson to escape, the danger to the public would not have been eliminated. Williamson would have had no way "to convey convincingly" to Ferguson "that the chase was off, and that he was free to go." *Scott v. Harris*, 550 U.S. at 385. Ferguson "might have been just as likely to respond" to Williamson abandoning pursuit "by continuing to drive recklessly as by slowing down and wiping his brow." *Id.* Therefore, Williamson resolved to fire his weapon to prevent Ferguson from inflicting injury or death on others. In the eyes of a reasonable officer, Ferguson posed a serious danger to the public, and Williamson acted accordingly.

The *Graham* factors bolster the reasonableness of Williamson's use of deadly force. 490 U.S. at 396. First, in the course of recklessly driving through a residential neighborhood, fleeing

from police, and running a roadblock, Ferguson certainly provided Williamson with probable cause to believe that a felony occurred. Second, while no pedestrians or additional drivers appear in the video evidence, the pursuit took place in a populated area. The chase began on the lawns of a residential neighborhood and continued past numerous homes. Ferguson's reckless disregard for the safety of others posed an obvious threat to anyone in the vicinity. *See Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007). Third, Ferguson actively evaded arrest by flight, and in doing so, he ignored all of Williamson's efforts to seize him with a lesser degree of force.

Ferguson's perilous conduct closely resembles the type of behavior presented in prior case law approving of the use of deadly force even when no one is immediately in front of the suspect's fleeing vehicle. *See Plumhoff v. Rickard*, — U.S. —, 134 S. Ct. 2012, 2021–22, 188 L. Ed. 2d 1056 (2014) (noting that the suspect led police on a high-speed chase down a highway and, after being brought to a near standstill, attempted to resume his flight despite the efforts of police to block his path); *Hocker*, 738 F.3d at 154–55 (noting that the suspect led police on a nighttime, high-speed chase down a winding back road and reversed his vehicle into a cruiser); *Williams*, 496 F.3d at 486–87 (noting that, once boxed in by police, the suspect backed into one cruiser and then, ignoring an officer with his weapon drawn, accelerated onto the sidewalk to avoid another cruiser); *Scott v. Clay Cnty.*, 205 F.3d 867, 871–72 (6th Cir. 2000) (noting that the suspect led police on a high-speed chase, where he narrowly missed an unmarked cruiser and nearby officer, crashed into a guardrail, and forced another officer to leap out of his path); *Freland*, 954 F.2d at 344, 346–47 (noting that, after a high-speed chase, the suspect appeared trapped on a dead-end, residential street but freed his car by hitting a cruiser, and then accelerated toward a roadblock); *see also Cass*, 770 F.3d at 376–77 (noting that the suspect

struck two officers while attempting to flee a drug bust and that additional officers remained in close proximity). The facts of those cases are quite comparable to the situation Williamson encountered. First, Ferguson drove wildly across the lawns of a residential neighborhood. Then, he fled down narrow roads at night without regard for stop signs or proper lanes. Finally, after Ferguson lost control of his car, he resumed his flight by running Williamson's roadblock. The relevant precedent confirms that Williamson responded reasonably by using deadly force in those tense, uncertain, and rapidly evolving circumstances.

Furthermore, this case is readily distinguishable from prior decisions allowing similar claims of excessive force to survive summary judgment. *See Kirby v. Duva*, 530 F.3d 475, 482–83 (6th Cir. 2008); *Sigley v. City of Parma Heights*, 437 F.3d 527, 536 (6th Cir. 2006); *Cupp*, 430 F.3d at 774–75. *Kirby*, *Sigley*, and *Cupp* each involved a factual dispute requiring the reviewing court to assume that the suspect drove safely and presented a minimal threat. *Kirby*, 530 F.3d at 482–83; *Sigley*, 437 F.3d at 536; *Cupp*, 430 F.3d at 774–75. Here, Plaintiff does not identify a genuine issue of material fact. Rather, she raises a question of law, challenging the reasonableness of Williamson's use of deadly force in light of the undisputed facts. *Scott v. Harris*, 550 U.S. at 381 n.8. The record in this case does not permit an assumption that Ferguson's continued flight posed no serious danger. His reckless disregard for others' safety is apparent from the video evidence. All parties agree that the video evidence is authentic and accurately depicts the actions of Ferguson and Williamson. Any allegation that Ferguson drove in a restrained, conscientious manner throughout the chase would wholly contradict the record and thus fail to raise a *genuine* factual dispute. *See id.* at 378–81. Accordingly, the claim that Williamson violated Ferguson's Fourth Amendment rights is appropriately resolved on summary judgment.

Based on the undisputed facts prior to the shooting, Ferguson's reckless flight presented a grave risk to the public, and absent police intervention, he would have continued to endanger lives. Williamson certainly had probable cause to believe that Ferguson posed a threat of serious physical harm to others. Under the circumstances, Williamson's use of deadly force to end that threat was objectively reasonable. Williamson's conduct did not violate the Fourth Amendment. Because no constitutional violation occurred, the § 1983 claim against Williamson in his individual capacity fails on its own merits. The Court concludes that Williamson is entitled to summary judgment on that claim without need of his qualified immunity defense.

### 2. Qualified Immunity Defense

The Court's conclusion that Williamson's conduct did not violate the Fourth Amendment entitles him to summary judgment on the § 1983 claim. But, even if the opposite result had been reached, the Court would still grant summary judgment in favor of Williamson based on qualified immunity.

An officer sued under § 1983 is entitled to qualified immunity unless it is shown that he violated a statutory or constitutional right that was "clearly established" when the challenged conduct occurred. *Harlow*, 457 U.S. at 818. The inquiry into whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff*, 134 S. Ct. at 2023. While a case need not be directly on point, "existing precedent must have placed the statutory or constitutional question" faced by the officer "beyond debate." *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011). The qualified immunity analysis

recognizes that "reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. Qualified immunity "protect[s] officers from the sometimes 'hazy border between excessive and acceptable force'" and ensures that they are on notice that their conduct is unlawful before being subjected to suit. *Id.* at 206 (quoting *Priester v. City of Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir. 2000)).

The Supreme Court's decisions in *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam), and *Plumhoff*, 134 S. Ct. at 2012, demonstrate that as of December 7, 2012—the date of the events at issue here—no clearly established law precluded Williamson's conduct. In *Brosseau*, the Supreme Court held that a police officer did not violate a clearly established right when she fired through the rear driver's side window of a fleeing vehicle to prevent possible harm to "other officers on foot who [she] believed were in the immediate area, . . . occupied vehicles in [the suspect's] path[,] and . . . any other citizens who might be in the area." 543 U.S. at 197, 201 (quoting *Haugen v. Brosseau*, 339 F.3d 857, 865 (9th Cir. 2003)) (internal quotation marks omitted). The Supreme Court cautioned against using *Graham* and *Garner* alone to find that an officer violated a suspect's clearly established constitutional right. *Id.* at 198–99. The standards in those cases "are cast at a high level of generality" and do little more than "follow[] the lead of the Fourth Amendment's text." *Id.* at 199. It is only in the "obvious case" that *Graham* and *Garner* "can 'clearly establish' the answer, even without a body of relevant case law." *Id.* After examining then-existing lower court decisions concerning the reasonableness of deadly force as a response to vehicular flight, the Supreme Court observed that "this area is one in which the result depends very much on the facts of each case" and that "[t]he cases by no means 'clearly establish' that [the officer's] conduct violated the Fourth Amendment." *Id.* at 201.

Last year, the Supreme Court in *Plumhoff* held that police officers did not violate a clearly established right when they fired on a suspect's vehicle as he attempted to resume his flight after spinning out into a parking lot. 134 S. Ct. at 2017–18, 2023. There, three officers collectively fired fifteen shots "to put an end to what had already been a lengthy, high-speed pursuit that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby." *Id.* at 2023–24. In reaching its conclusion, the Supreme Court relied heavily on *Brosseau*. *Id.* The Supreme Court declared that *Brosseau* made plain that as of February 21, 1999, "it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger." *Id.* at 2023. In *Plumhoff*, qualified immunity protected the officers because the plaintiff could not "meaningfully distinguish" *Brosseau* or "show that its analysis was out of date" by July 18, 2004—the date of the relevant conduct. *Id.* at 2024.

Likewise, Plaintiff cannot establish that Williamson's conduct in this case was "materially different" from the conduct in *Brosseau* or *Plumhoff*. *See id.* at 2023. The facts here are closely analogous to the *Plumhoff* situation and, in certain ways, more favorable to the officer than the circumstances in *Brosseau*. First, the *Plumhoff* officers pursued a reckless driver on an extended chase, and after that driver lost control of his vehicle, he attempted to resume his flight despite police gunfire and attempts to block his escape. *Id.* at 2017–18. Similarly, Williamson pursued Ferguson down narrow roads at night until Ferguson's reckless driving caused his car to spin out of control. Ferguson then endeavored to restart the hazardous chase—undeterred by verbal commands, shots fired to disable his vehicle, and a roadblock. Second, in *Brosseau*, an officer on foot opened fire on a driver who had just begun to flee and who had not yet driven in a

-16-

dangerous manner. 543 U.S. at 196–97. In contrast, Williamson used deadly force on Ferguson only after observing the reckless nature of his driving and his bold efforts to resist capture.

Because Plaintiff cannot distinguish *Brosseau* and *Plumhoff*, her only option is to show that between July 18, 2004, and December 7, 2012, the reasoning in those cases was rejected by "controlling authority" or a "robust consensus of persuasive authority." *See Plumhoff*, 134 S. Ct. at 2023 (quoting *al-Kidd*, 131 S. Ct. at 2084) (internal quotation marks omitted). However, Plaintiff has not directed the Court to any such authority. As noted above, the decisions of the Sixth Circuit predominantly support the reasonableness of Williamson's conduct in this situation. *See Hocker*, 738 F.3d at 154–55; *Williams*, 496 F.3d at 486–87; *Scott v. Clay Cnty.*, 205 F.3d at 871–72, 878; *Freland*, 954 F.2d at 344, 346–47; *see also Cass*, 770 F.3d at 376–77. Contrary to Plaintiff's argument, this case is far from an "obvious one" where the general principles of *Graham* and *Garner* alone provide a basis for decision. *Brosseau*, 543 U.S. at 199. While *Kirby*, *Sigley*, and *Cupp* relied on those general principles for the clearly established law, each of those cases required the court to accept as true an allegation that the suspect never endangered anyone. *Kirby*, 530 F.3d at 483–84; *Sigley*, 437 F.3d at 537; *Cupp*, 430 F.3d at 776–77. That precedent bears little resemblance to the present case. Here, Ferguson's behavior prior to the shooting is undisputed. Ferguson's disregard for the safety of officers, motorists, and pedestrians is obvious from the video evidence. *See Scott v. Harris*, 550 U.S. at 380.

The Court, of course, maintains that the alleged violation of Ferguson's Fourth Amendment rights is meritless in the first instance. But, in the alternative, the Court concludes that Williamson holds qualified immunity for the conduct at issue because he violated no clearly established rights. Again, Williamson is not liable under § 1983 in his individual capacity, and the Court will grant summary judgment in his favor on that claim.

B.  Section 1983 Claims Against the Remaining Defendants

The resolution of the § 1983 claims against the remaining Defendants requires only brief explanation in light of Williamson's constitutionally permissible use of force. To start, Plaintiff contends that Shoffner—the LaRue County Sheriff when the shooting occurred—is liable under § 1983 in his individual capacity for failing to adequately train and supervise Williamson. Section 1983 liability, however, must be premised on more than respondeat superior, or the right to control employees. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

> A supervisor is not liable pursuant to § 1983 for failing to train unless the supervisor "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers."

*Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (quoting *Shehee*, 199 F.3d at 300). Here, Shoffner is not liable for encouraging or directly participating in unconstitutional conduct because Williamson did not violate the Fourth Amendment. Plaintiff also concedes that the record does not a support a finding of Shoffner's personal involvement in the shooting. (Pl.'s Resp. in Opp'n to Defs.' Mot. for Summ. J., DN 48, at 22.) For those reasons, the Court will grant summary judgment in Shoffner's favor.

Next, Plaintiff asserts § 1983 claims against LaRue County and the LaRue County Sheriff's Office, along with Williamson, Shoffner, and Edlin in their official capacities, for allegedly violating Ferguson's Fourth Amendment rights. As an initial matter, the Court notes that LaRue County stands as the only true defendant to such claims. First, the LaRue County Sheriff's Office, as a municipal department, is not a "person" subject to suit under § 1983. *Petty v. Cnty. of Franklin*, 478 F.3d 341, 347 (6th Cir. 2007); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *Rhodes v. McDannel*, 945 F.2d 117, 120 (6th Cir. 1991) (per curiam). Second,

-18-

the official-capacity claims against Williamson, Shoffner, and Edlin are equivalent to claims against LaRue County—the public entity that the officers represent. *Kentucky v. Graham*, 473 U.S. 159, 165–66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* at 166 (citing *Brandon v. Holt*, 469 U.S. 464, 471–72, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985)). Accordingly, the Court must address the question of LaRue County's liability under § 1983.

A municipality or local government, such as LaRue County, may be held liable under § 1983 only if the constitutional violation resulted from an official policy or custom. *Monell v. Dep't of Soc. Servs.*, 463 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Nevertheless, the conclusion that Williamson did not deprive Ferguson of his Fourth Amendment rights defeats the claim against LaRue County as well. *Scott v. Clay Cnty.*, 205 F.3d at 879. Absent a constitutional injury, the Court need not examine the policies and customs of LaRue County. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (per curiam). Therefore, Defendants are also entitled to summary judgment on the § 1983 claims brought against LaRue County, the LaRue County Sheriff's Office, and the officers in their official capacities.

### C. State Law Claims

Finally, Plaintiff alleges a number of claims arising under Kentucky law and implicating the availability of state law immunities. Pursuant to 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." Having concluded that all federal claims over which the Court has original jurisdiction must be dismissed, the Court declines to

exercise supplemental jurisdiction over the remaining state law claims. *Id.*; *see United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966). The Court therefore will dismiss Plaintiff's state law claims without prejudice. Defendants' motion for summary judgment will be denied to the extent it seeks resolution of those state law claims.

## IV. CONCLUSION

For the reasons stated above, the Court will grant in part and deny in part Defendants' motion for summary judgment (DN 44). Plaintiff's federal claims will be dismissed with prejudice, and her state law claims will be dismissed without prejudice. A separate order will be entered this date in accordance with this Memorandum Opinion.

February 19, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**